UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SAMUEL VALDEZ,

                    Petitioner,

          v.

RONALD HAYNES,

                    Respondent.

Case No. C21-5322-DGE-SKV

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Samuel Valdez is a Washington prisoner who is currently confined at the Stafford Creek Corrections Center in Aberdeen, Washington.  He seeks relief under 28 U.S.C. § 2254 from a 2016 Wahkiakum County Superior Court judgment and sentence.  Respondent has filed an answer responding to Petitioner's federal habeas claims and has submitted relevant portions of the state court record.  Petitioner has filed a response to Respondent's answer.  This Court, having carefully reviewed Petitioner's petition for writ of habeas corpus, all briefing of the parties, and the state court record, concludes that the petition should be denied, and this action should be dismissed with prejudice.

REPORT AND RECOMMENDATION
PAGE - 1

## II.    FACTUAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts relevant to

issues before the Court in this federal habeas proceeding as follows:

A.    Events Leading to Valdez's Arrest

1.    Marriage and Divorce

Valdez married Elizabeth Robbins in 2002.  Valdez filed for divorce in the
fall of 2012.  A trial was held on the division of property from the marriage in
2014.  Neighbors of Valdez's and Robbins's, the Cantrells and the Bruneaus,
supported Robbins in the divorce.  The dissolution trial court issued its judgment
on the separation of the property on July 1, 2014.

2.    Friendship with Christopher Horton

In the late summer or early fall of 2012, Christopher Horton moved into
the neighborhood in Wahkiakum County where Valdez and Robbins had built a
shop with an apartment attached.  Valdez and Horton developed a friendship, and
they spent time together almost daily.  One of the common interests Valdez and
Horton shared was the cultivation and consumption of marijuana.

Valdez had a medical marijuana card and had been in the marijuana
business since before he and Robbins were married.  Valdez grew an unknown
number of marijuana plants and did not try to keep his marijuana activities secret.

Valdez bought a machine that converted marijuana plant material into
marijuana oil.  The marijuana oil was a "tarry substance" with the "[c]onsistency
of honey."  Verbatim Report of Proceedings (VRP) (Feb. 16, 2016) at 287.
Horton helped Valdez unpack the machine in Valdez's shop.  Valdez would run
about 10 pounds of dried and cured marijuana through the machine every 24
hours.  Ten pounds of marijuana plant material would yield one pound of
marijuana oil.

Horton helped Valdez market the marijuana oil product by introducing
Valdez to several people who either had licenses, or were applying for licenses, to
produce and sell marijuana products.  Horton also introduced Valdez to
individuals who bought marijuana oil from Valdez or was interested in purchasing
the marijuana oil for "the black market" and "taking it across the country."  VRP
(Feb. 16, 2016) at 300.

Valdez frequently discussed his divorce from Robbins with Horton.
Horton testified that Valdez was "very, very upset" with Robbins and anyone who

REPORT AND RECOMMENDATION
PAGE - 2

"was on [her] side," so much so that Valdez "would talk about wanting to blow holes in people's properties." VRP (Feb. 16, 2016) at 270-71. The "people's properties" that Valdez was referring to belonged to Robbins, the Cantrells, and the Bruneaus. VRP (Feb. 16, 2016) at 271.

On July 7 or 8, 2014, Valdez went to Horton's house with matchsticks, cotton, and a soda bottle, along with ground hamburger and rat poison that he said was to silence the Cantrell's dogs. On July 9, 2014, in the early morning hours, the Cantrell's house burned down.

Sometime after 7:30 that morning, Valdez drove to what remained of the Cantrell's house. Valdez asked a neighbor who was also there if anyone was killed. The neighbor told Valdez that the Cantrells were alive, but their pets had died. Valdez nodded and then drove away. The same morning, Valdez went to Horton's house and told Horton:

> [t]hat he [Valdez] gave them what they deserved. He burned their house down. And that he watched the fire keep—he was all worked up and antsy about it. He was very full of adrenaline and very full of anger and satisfaction in an eerie way and was essentially bragging about it, but also very concerned about being quiet, making sure there was nobody in my house, to keep it quiet. He described to me where he was. He was up all night. He stood in his boat and watched the fire trucks go by the house. He thought that was funny.

VRP (Feb. 16, 2016) at 330.

Horton testified that Valdez told him on "numerous occasions" that "[h]e [Valdez] burned their [Cantrell's] house down," and would comment about "another barbecue in the neighborhood" and "[s]moking out the neighborhood," as code for arson. VRP (Feb. 16, 2016) at 327. An investigation did not reveal enough information to determine the cause of the Cantrell fire, and the cause was labeled "undetermined." VRP (Feb. 23, 2016) at 1089.

Also during the summer of 2014, and after the dissolution trial court issued its judgment in the divorce, Valdez took his kayak from the beach where Horton lived and paddled to the front of the Bruneaus's property. Horton accompanied Valdez. In front of the Bruneaus's property, Valdez took pictures of the property and the Bruneaus's catamaran. Valdez told Horton he "wanted to catch their catamaran on fire." VRP (Feb. 16, 2016) at 332.

During the winter months, in late 2014 or early 2015, Valdez told Horton he "was wanting to blow the Bruneaus up." VRP (Feb. 17, 2016) at 349. At the time, the area was expected to receive five or more inches of rain, and Valdez told

REPORT AND RECOMMENDATION
PAGE - 3

Horton that his plan was to clog the culvert above the Bruneaus's house, so that the water would "raise above and essentially wipe out their whole property below." VRP (Feb. 17, 2016) at 350. Horton unclogged the culvert on two separate occasions after Valdez told Horton he was going to clog it.

        3.      Investigation of Valdez by Law Enforcement

Horton reported Valdez to law enforcement in April or May of 2015. He told law enforcement that Valdez planned to kill Robbins, had burned down the Cantrell's house, and intended to burn the Bruneaus's catamaran.

Horton also reported that he told Valdez that he had an uncle in the mafia who lived in Michigan and who could be hired to kill someone. Horton testified that he told Valdez this because "if I hadn't, then he would have found somebody else and we wouldn't be here." VRP (Feb. 17, 2016) at 437-38.

Law enforcement decided to "place a wire on" Horton. VRP (Feb. 17, 2016) at 357. Horton wore a "wire" on three occasions. VRP (Feb. 17, 2016) at 363.

        a.    First "Wire" Recording

Horton first wore a "wire" on May 20, 2015. VRP (Feb. 17, 2016) at 364-65. The "wire" recorded:

> MR. HORTON: And I told him. He [Horton's alleged uncle] was like, "Well, how do you know he's [Valdez's] clean?" I said, "Well, you know, I witnessed him burning down the neighbor's house. I witnessed attempted murder there." You know, I said, "You know, he's not the type to just talk about shit. He actually does it. I mean, I've witnessed it with multiple neighbors and with multiple instances." And so I said, "he's solid. He's a solid guy." I mean, and that's just kind of how I hold him. I mean, he's the only one I've ever talked to about that shit. But I had to f[***]ing—I had to put it out there. He laughed at me. He thought it was funny. He said, "Attempted, huh?" I said—
>
> THE DEFENDANT: Yeah. It's going to go—you know, it's going to go further than that. I'm either going to have to hire a f[***]ing gun or I'm going to have to f[***]ing do it myself.
>
> MR. HORTON: To who? These—these people?
>
> THE DEFENDANT: These people. The list.

REPORT AND RECOMMENDATION
PAGE - 4

1       MR. HORTON: The list?

2       THE DEFENDANT: The list.  I'm working on—I'm going to work on the f[***]ing list.  In fact, I've got—you made me laugh, because there was one time you said to me, "Sam, there's no f[***]ing morning I get up, I don't take my f[***]ing shower, I think about who the f[***]ing I'm going to kill today."  And that has been the way it has been for me for f[***]ing—two f[***]ing years.

6       MR. HORTON: Yeah.

7       THE DEFENDANT: And it's not f[***]ing going away.  And unless—that's another thing that I want—you know what?  The direction we're headed with this, yeah.  I want to send a very clear message to her that I am going to haunt that f[***]ing bitch for the rest of her f[***]ing days if she doesn't sit down and we square this f[***]ing inequity in the judicial system up.  So what has haunted me for the last couple of days since we talked is how do I do that?  Do I just send little f[***]ing messages?  Do I sit down with her and say, "Hey, Beth, you know this thing has bugged me for f[***]ing two years and it'll bug me for the rest of my f[***]ing life unless we sit down and work this f[***]ing thing out to where at least both of us walk away either equally unhappy or equally happy.  You, you know, make your choice.  But if I don't walk away from there somewhat—if we don't—if we don't work this out some way or another, believe me, there's not going to be a day that goes by that I don't think about how I'm going to get back at you."

16       MR. HORTON: Yeah.

17       THE DEFENDANT: I try to be nice about it as I can.  But she's a stupid f[***]ing bitch, you know.  I want to tell her, "Well, I've tried to send you some messages.  By the way, how's Kathy in her new house doing," you know?

19       MR. HORTON: Kathy?  Yeah. Gotcha, gotcha.  Kathy, and I don't remember his name.

21       THE DEFENDANT: Fred.

22       MR. HORTON: That's right.  Kathy and Fred [Cantrell].

REPORT AND RECOMMENDATION
PAGE - 5

THE DEFENDANT: The f[***]ing two liars in the courtroom. . . .

. . . . .

MR. HORTON: How did that f[***]ing work?  You burned their f[***]ing house down and then they go and get insurance money and—

THE DEFENDANT: No.  Actually, I think Beth has picked—paid a big chunk on f*** building that house.

. . . .

THE DEFENDANT: You starting to get the picture of what I got to get the message to her?  How much carnage do you want to be responsible for is the message I need to f[***]ing get her.

MR. HORTON: But you're not going to go after those people again, are you?  I mean, f[***], that's a—you got to leave them alone.  I could—whatever.

THE DEFENDANT: You don't know me very f[***]ing— do you?

. . . .

MR. HORTON: No.  It's good.  I mean, you got to get it out in the open now.  I mean, my uncle said that he'll be in town. . . . A flight round trip is 450 bucks.  You got to pay for rental car, which is $300.  And he'll be in town the beginning week of June. Prior arrangements as—as we spoke are, you know, 10,000 and $5,000 on top of that for each head.

THE DEFENDANT: Now, wait a minute.  Is that—so that's $15,000 for the first head?

MR. HORTON: No.  It's 15 for two.

THE DEFENDANT: Oh, I see.  First one ten and the rest are five.

REPORT AND RECOMMENDATION
PAGE - 6

VRP (Feb. 17, 2016) at 392-96, 401.[1]

b. Second "Wire" Recording

Horton wore a "wire" a second time on June 16, 2015.  During this meeting, Valdez told Horton that he wanted to hold off on hiring Horton's alleged uncle to kill anyone, saying instead that he wanted to "table the matter" because "money is tight right now."  VRP (Feb. 17, 2016) at 507.

c. Third "Wire" Recording

Horton wore a "wire" a third time on June 23, 2015.  VRP (Feb. 17, 2016) at 528.  On this recording, Valdez stated that he would pay Horton's uncle in marijuana oil and that he would give Horton's uncle a deal on the value of the marijuana oil at $18 per gram.  The following interaction was also recorded:

> MR. HORTON: Once we leave here—once we leave here, the deal's done.  It's done.  It's solidified.  I mean, we're . . .
>
> THE DEFENDANT: It was f[***]ing done the day I said f[***]ing do it.
>
> MR. HORTON: Okay.  Well, it's a done deal.  So I'll follow you back to your place and grab the oil and I'll put it in the mail tomorrow for him.  And then I'll go but the plane ticket, cash.

VRP (Feb. 18, 2016) at 590.  Valdez then gave Horton a container of marijuana oil.  Horton testified that Valdez "handed me some cannabis oil in payment for the murder of his wife, and also pictures of her residence and pictures of her." VRP (Feb. 17, 2016) at 524.  As Horton was leaving, the following exchange was recorded:

> THE DEFENDANT: . . . It's like—it's like buying a lottery ticket, as far as I'm concerned.
>
> MR. HORTON: M-hm.
>
> THE DEFENDANT: I bought my ticket, you know, and what if I really f[***]ing win?

---

[1] [Court of Appeals footnote 1] After the first recording finished playing at trial, the trial court acknowledged the presence of some reporters in the courtroom, and admonished the jury, "I assume there will be some sort of articles, as we discussed before.  Please put them aside until the trial's over.  If anybody wants to talk about them, tell them you're under instructions.  Make me the bad guy."  VRP (Feb. 17, 2016) at 434-35.

REPORT AND RECOMMENDATION
PAGE - 7

1        MR. HORTON: You'll win.

2        THE DEFENDANT: Oh yeah.

3    VRP (Feb. 18, 2016) at 616-17.  Horton gave the container of marijuana oil and
     the pictures that Valdez had given him to law enforcement the same day.

4        4.      Search Warrant Executed

5        Law enforcement secured and executed a search warrant on Valdez's shop
6    and apartment.  Law enforcement found 14 mason jars of marijuana oil in a
     refrigerator, totaling 4,828 grams; 5 mason jars of marijuana oil in a freezer,
7    totaling 5,808 grams; a bag of marijuana in the bathroom, weighing 54.4 grams; a
     bag of marijuana in the shop, weighing 18 grams; a bag of marijuana on a
8    catwalk, weighing 129.2 grams; 2 containers of marijuana oil on a table in the
     shop, weighing 513 grams; a box of 73 e-cigarette cartridges with approximately
9    1 gram of marijuana oil in each in the shop; "vape pens"; a backpack in the shop
     that had 77 grams of marijuana oil in cartridges; another 150 cartridges each
10   loaded with about 1 gram of marijuana oil; syringes; and marijuana plants outside.
     Law enforcement testified that the vape pens were for smoking marijuana oil
11   contained in the cartridges and that the syringes were likely used for filling the
     cartridges.

12   B.      Pretrial Procedure

13       Valdez was arrested on July 3, 2015.  Valdez was charged with solicitation
14   to commit first degree murder, first degree arson, delivery of marijuana, and
     possession with intent to manufacture or deliver marijuana.

15       In November 2015, Valdez filed a motion for a change of venue from
16   Wahkiakum County Superior Court.  Attached to the motion were several articles
     from local media sources regarding Valdez's case.  The State did not object to the
17   venue being changed.  The trial court stated that before it decided on the motion
     for a change of venue, it would review the answers given on a questionnaire to the
18   jury venire to see if it was possible to select an unbiased jury.

19       The jury venire was comprised of 55 potential jurors.  Each member of the
     venire was given a "juror questionnaire,"

20
         To determine if you know anything about the allegations in this
21       case and, if so, what you know and from what source you obtained
         your knowledge.  Additionally, the names of potential witnesses
22       are included in this questionnaire, to determine whether you know
         any of them and how you are acquainted with them.

23

REPORT AND RECOMMENDATION
PAGE - 8

Five venire members did not answer whether they had heard about the case; five said they had heard about the case but were not sure or did not have an opinion about the case; eight said they had heard about the case and could not be impartial; one had fought the fire at the Cantrell's home; thirty-one had varying degrees of familiarity with the case but said they could be impartial; and one had heard about the case but did not answer the remaining questions. Three others indicated on the questionnaire that they were unavailable on the dates that trial was scheduled.

After excusing some of the venire members who stated they could not be impartial or were otherwise unable to serve on the jury, the defense renewed its motion for a change of venue, citing the number of venire members who had heard of the case or knew potential witnesses. The trial court denied the motion, stating that there were still 40 members of the potential jury pool, and that while most of the potential jurors indicated they knew something of the case, the court would attempt to empanel a jury before considering a motion for change of venue.

After voir dire concluded, the trial court granted four of the defense's for-cause challenges. The defense also joined in the State's single for-cause challenge, which the trial court granted. During the for-cause challenges, the defense again moved for a change of venue. The trial court denied the motion stating that it believed a fair jury could be seated based on the answers given in voir dire.

The trial court gave each side one extra peremptory challenge. The State waived its fourth, fifth, and sixth peremptory challenges. The defense waived its sixth peremptory challenge and accepted the jury. Fourteen members of the venire were selected for the jury, two of which were designated as alternates. After the jury was empaneled and sworn, the trial court instructed the jurors to not discuss the case amongst themselves or with others for the duration of the case, to "not read or listen to any newspaper or radio reports about the case," and to "keep your mind free of any influences from outside the courtroom." VRP (Feb. 16, 2016) at 203.

Dkt. 9, Ex. 25 at 2-11.

### III.    PROCEDURAL BACKGROUND

Petitioner was charged with, and convicted of, solicitation to commit first degree murder, first degree arson, delivery of marijuana, and possession with intent to manufacture or deliver marijuana. Dkt. 9, Ex. 20 at 1, Ex. 25 at 1. Petitioner was sentenced on March 14, 2016, to a

REPORT AND RECOMMENDATION
PAGE - 9

total term of 250-months confinement, and he thereafter appealed to the Washington Court of Appeals. *Id.*, Ex. 20 at 4, Ex. 22.

**A.    Direct Appeal**

Petitioner's appellate counsel identified the following sixteen assignments of error in Petitioner's opening brief on appeal:

1.    The trial court erred by denying the motion for a change of venue.

2.    The trial court's denial of the motion to dismiss the arson charge for insufficient evidence and lack of corpus delicti, was error.

3.    The jury's verdict of guilty on the possession of marijuana with intent to manufacture or distribute, without sufficient evidence, was error.

4.    The prosecutor's misconduct in misstat[ing] the burden of proof and reasonable doubt, was error.

5.    The trial court's admission of prior bad acts, was error.

6.    The prosecutor's misconduct in giving personal opinions on the witnesses' veracity, was error.

7.    The prosecutor's misconduct in impugning defense counsel, was error.

8.    The prosecutor's misconduct in telling the jury that Mr. Valdez was incarcerated, was error.

9.    Defense counsel's failure to object to the State's misstatement of the burden of proof and reasonable doubt, was error.

10.    Defense counsel's failure to object to the admission of prior bad acts under ER 404(b), was error.

11.    Defense counsel's failure to object to the State's comments on Mr. Valdez's veracity and calling him a liar, was error.

12.    Defense counsel's failure to object to the State's argument, stating a personal opinion, was error.

13.    Defense counsel's failure to object to the State's impugning defense counsel, was error.

REPORT AND RECOMMENDATION
PAGE - 10

14.     Defense counsel's failure to object to the State telling the jury that Mr. Valdez was in custody, was error.

15.     The denial of the right to a fair trial, based on cumulative error, was error.

16.     The imposition of legal financial obligations, without adequately considering Mr. Valdez's ability to pay, was error.

*Id.*, Ex. 22 at 1-2.  On June 27, 2017, the Court of Appeals issued an unpublished opinion affirming Petitioner's convictions but reversing the trial court's imposition of discretionary legal financial obligations ("LFOs").  *Id.*, Ex. 25.  The Court of Appeals remanded the case to the Superior Court for further proceedings with respect to the imposition of LFOs.  *See id.*, Ex. 25 at 37-38.)

Petitioner thereafter sought discretionary review by the Washington Supreme Court.  *Id.*, Ex. 26.  Petitioner, in the petition for review prepared by his appellate counsel, identified the following five issues for review:

1.     The trial court erred by denying Valdez's motion for a change of venue where there had been inflammatory pre-trial publicity, the State had commented on the case to the media, the charges were serious, the county was extraordinary [sic] small, and the trial court did not conduct individual voir dire.

2.     The trial court erred by denying Valdez's motion to dismiss the arson charge where there was insufficient evidence of corpus deliciti [sic], and the corroboration was established by Valdez's statements and the testimony of a witness who was found to be not credible.

3.     The prosecutor committed flagrant and ill-intentioned misconduct which prejudiced Valdez by misstating the burden of proof and reasonable doubt, giving personal opinions on Valdez's veracity and on the testimony of a defense witness, impugning defense counsel, and telling the jury that Valdez had been incarcerated.

4.     Valdez received ineffective assistance of counsel because his attorney failed to object to the State's misconduct, and by failing to properly object to prior bad acts under ER 404(b).

5.     The cumulative effect of these errors denied Valdez his right to a fair trial.

REPORT AND RECOMMENDATION
PAGE - 11

1  *Id.*, Ex. 26 at 6.  The Supreme Court issued an order denying review without comment on

2  December 6, 2017, and the Court of Appeals issued a mandate terminating direct review on

3  December 14, 2017.  *Id.*, Exs. 27, 28.

4     **B.     First and Second Personal Restraint Petitions**

5         On May 29, 2018, Petitioner filed a motion for relief from judgement under Washington

6  Superior Court Criminal Rule (CrR) 7.8 in the Wahkiakum County Superior Court.  Dkt. 9, Ex.

7  29.  Petitioner argued in his affidavit in support of his motion that state witness Christopher

8  Horton was not reliable or credible, that he perjured himself at trial, and that he conspired with

9  the prosecutor to introduce testimony they knew to be false.  *Id.*, Ex. 29 at 4-6.  The Wahkiakum

10  County Superior Court subsequently transferred Petitioner's motion to the Washington Court of

11  Appeals for consideration as a personal restraint petition.  *Id.*, Ex. 30.

12         On November 13, 2018, Petitioner moved for permission to supplement his petition and

13  for additional time to file the supplemental petition.  *Id.*, Ex. 32.  The Commissioner of the Court

14  of Appeals granted Petitioner's motion on November 20, 2018, and directed that the

15  supplemental petition be filed within 60-days.  *Id.*, Ex. 33.  The Commissioner also advised

16  Petitioner that he would have to address the applicability of the state's one-year time bar for

17  collateral relief, RCW 10.73.090, in relation to any new claims asserted in the supplemental

18  petition.  *Id.*

19         On January 18, 2019, Petitioner filed another personal restraint petition with the Court of

20  Appeals.  *See id.*, Exs. 34.  Petitioner argued in his second petition that (1) the prosecution used

21  perjured testimony from Christopher Horton to secure a conviction and failed to disclose to the

22  defense the contents of additional meetings with Horton, (2) the court order authorizing the

23  police to record Petitioner's conversations with Horton was invalid because the affidavit offered

REPORT AND RECOMMENDATION
PAGE - 12

1    in support of the application to intercept and record the conversations was insufficient, and (3) he

2    was denied a fair trial by the setting of an excessive bail, the imposition of extreme courthouse

3    security measures, instructional error, and interference with his ability to effectively

4    communicate with counsel.  *Id*.  Petitioner moved to consolidate his new petition with his prior

5    petition and that motion was granted.  *Id*., Ex. 38.

6         Months later, in April 2019, Petitioner again moved for permission to supplement his

7    personal restraint petition and for additional time to submit his supplemental petition.  *Id*., Ex.

8    40.  The state opposed Petitioner's motion, but the Court of Appeals Commissioner granted the

9    motion and advised Petitioner again that any new issues raised in the supplemental petition may

10   be subject to the one-year time bar, RCW 10.73.090.  *Id*., Exs. 41, 42.  Plaintiff thereafter filed

11   his second supplemental petition in which he raised three grounds for relief which he indicated

12   should replace the three grounds raised in his prior petition.  *Id*, Ex. 43.  The three purportedly

13   new grounds set forth in the supplemental petition were substantially similar to the three grounds

14   identified in Petitioner's second personal restraint petition.  In particular, Petitioner argued that

15   (1) the prosecutor knowingly used perjured testimony from Christopher Horton to secure a

16   conviction and failed to share with the defense information regarding additional interviews

17   conducted with Mr. Horton, (2) the court order authorizing the police to record Petitioner's

18   conversations with Horton was invalid because the affidavit offered in support of the application

19   to intercept and record the conversations was insufficient, and (3) he was denied a fair trial by

20   the setting of an excessive bail, the denial of counsel at his initial court hearing, the imposition of

21   extreme courthouse security measures, instructional error, and interference with his ability to

22   effectively communicate with counsel.  *Id.*

23

REPORT AND RECOMMENDATION
PAGE - 13

1        On March 3, 2020, the Washington Court of Appeals issued an unpublished opinion

2  denying Petitioner's personal restraint petition. *Id.*, Ex. 46. The Court of Appeals addressed the

3  merits of Petitioner's claim that the state knowingly presented perjured testimony from

4  Christopher Horton, and his claim that the state failed to disclose the prosecutor's additional

5  interviews with Horton, but held that Petitioner's other two grounds for relief, those presented

6  for the first time in his supplemental petitions, were time-barred under RCW § 10.73.090.[2] *Id.*

7        Petitioner thereafter filed a motion for discretionary review in the Washington Supreme

8  Court. *Id.*, Ex. 50. Petitioner argued in his motion for discretionary review that (1) he was

9  entitled to equitable tolling of the RCW 10.73.090 limitations period pursuant to which the Court

10  of Appeals found two of his grounds for relief time-barred, (2) he had submitted sufficient

11  evidence to demonstrate that Christopher Horton was not a reliable witness, and (3) he had

12  demonstrated that eight additional interviews with Mr. Horton should have been disclosed. *Id.* at

13  2. On June 1, 2020, the Commissioner of the Supreme Court denied Petitioner's motion for

14  discretionary review. *Id.*, Ex. 51. The Commissioner rejected Petitioner's challenge to the Court

15  of Appeals' conclusion that the additional grounds for relief asserted in Petitioner's supplemental

16  petitions were time-barred, noting that Petitioner had not asserted equitable tolling in the Court

17  of Appeals and could not raise it for the first time on discretionary review. *Id.*, Ex. 51 at 2. The

18  Commissioner also rejected Petitioner's arguments pertaining to his timely claims. *Id.*, Ex. 51 at

19

20

21

22

23

---

[2] On the same date, the Court of Appeals denied a motion to compel the prosecutor to produce all files related to Petitioner's prosecution that Petitioner had filed with that court shortly after he filed what was deemed his first supplemental personal restraint petition. Dkt. 9, Exs. 35, 47. In his motion to compel, Petitioner expressed a particular interest in obtaining information pertaining to additional interviews with Christopher Horton that were not shared with his counsel pre-trial. *See id.*, Ex. 35 at 2.

REPORT AND RECOMMENDATION
PAGE - 14

2-3. Petitioner did not seek further review, and the Court of Appeals issued a certificate of finality in Petitioner's personal restraint proceedings on July 24, 2020. *Id.*, Ex. 52.

On July 29, 2020, Petitioner filed a petition for writ of habeas corpus in the Grays Harbor County Superior Court alleging that his restraint pursuant to the Wahkiakum County judgement and sentence was unlawful because (1) the affidavit in support of the application for an order permitting the recording of his conversations with Christopher Horton failed the *Aguilar/Spinelli* test, (2) the prosecutor knowingly presented perjured testimony by Horton, (3) the prosecutor withheld evidence from the defense concerning Horton, (4) the prosecutor and judge interfered with his ability to communicate with counsel at trial, and (5) he was not provided counsel at his bail hearing. *Id.*, Ex. 53. The Superior Court transferred the petition to the Washington Court of Appeals for consideration as a personal restraint petition. *Id.*, Ex. 54. On December 10, 2020, the Court of Appeals dismissed the petition as time-barred under RCW § 10.73.090. *Id.*, Ex. 56. The Court of Appeals issued a certificate of finality in that proceeding on February 4, 2021. *Id.*, Ex. 57.

On February 23, 2021, Petitioner submitted to the Court of Appeals a document that was construed as a motion to recall the certificate of finality. *Id.*, Ex. 58. Shortly thereafter, on February 25, 2021, Petitioner filed a motion in the Court of Appeals seeking reconsideration of the decision dismissing the petition. *Id.*, Ex. 59. On March 16, 2021, the Court of Appeals denied Petitioner's motion to recall the certificate of finality and transferred Petitioner's motion for reconsideration to the Washington Supreme Court for consideration as a motion for discretionary review. *Id.*, Exs. 60, 61. Petitioner, in his motion to reconsider/motion for discretionary review, did not assert any claims relating to his conviction or sentence, he

REPORT AND RECOMMENDATION
PAGE - 15

1    challenged only the Court of Appeals' conclusion with respect to timeliness. *See id.*, Ex. 62. On

2    April 1, 2021, the Supreme Court Commissioner issued a ruling denying review. *Id.*, Ex. 64.

3           On October 28, 2020, while the petition for writ of habeas corpus Petitioner originally

4    filed in Grays Harbor Superior Court was pending in the Court of Appeals, Petitioner filed

5    another motion under CrR 7.8 in the Wahkiakum County Superior Court. *Id.*, Ex. 65. Petitioner

6    argued therein that (1) the order authorizing the recording of Petitioner's conversations with

7    Christopher Horton was invalid, (2) the prosecutor withheld evidence from the defense of

8    additional interviews with Horton, (3) the prosecutor knowingly presented perjured testimony at

9    trial, and (4) the statements made by detectives in their affidavit in support of their application

10   for an order authorizing the recording of Petitioner's conversations with Horton were based on

11   the unreliable statements of Horton. *Id.* The Superior Court noted that Petitioner's motion

12   appeared to be time-barred under RCW 10.73.090, and therefore transferred the motion to the

13   Court of Appeals for consideration as a personal restraint petition. *Id.*, Ex. 66.

14          On February 22, 2021, the Court of Appeals dismissed the petition as time barred under

15   RCW 10.73.090(1) because it was not filed within one year of the date on which Petitioner's

16   judgement and sentence became final, *i.e.*, December 14, 2017, the date the Court of Appeals

17   issued the mandate following his direct appeal. *Id.*, Ex. 68. Petitioner filed a motion for

18   reconsideration, arguing that he had demonstrated his petition should not be deemed time barred.

19   *Id.*, Ex. 69. The motion was forwarded to the Washington Supreme Court for consideration as a

20   motion for discretionary review. *Id.*, Ex. 70. The Supreme Court Commissioner issued a ruling

21   denying review on April 7, 2021, concluding that the Court of Appeals had properly dismissed

22   Petitioner's personal restraint petition as time barred. *Id.*, Ex. 71. The Court of Appeals issued a

23   certificate of finality in Petitioner's personal restraint proceedings on May 19, 2021. *Id.*, Ex. 72.

REPORT AND RECOMMENDATION
PAGE - 16

Petitioner submitted his federal habeas petition to this Court for filing on May 3, 2021. Dkt. 1. The briefing is now complete, and this matter is ripe for review.

## IV.    GROUNDS FOR RELIEF

Petitioner identifies four grounds for relief in his federal habeas petition which Respondent has summarized as follows:

1.    The trial court's order authorizing the recording of Valdez's conversation with Horton was invalid because the affidavit in support of the application was based on information from an unreliable informant.

2.    The prosecutor committed misconduct by (a) knowingly presenting Christopher Horton's perjured testimony, (b) withholding from the defense evidence of prosecution interviews of Horton, in violation of *Brady* and state discovery rules, and (c) arguing in closing that Valdez was a liar and a defense witness's conduct was "shameful," impugning defense counsel, and informing the jury Valdez was incarcerated.

3.    Defense counsel provided ineffective assistance at trial by (a) failing to object to the prosecutor's arguments, to the admission of evidence concerning arson, and the admission of prior bad act evidence under ER 404(b), (b) failing to give adequate direction to the defense investigator, (c) failing to spend sufficient time preparing Valdez to testify, (d) failing to adequately impeach Horton, and (e) failing to seek suppression of the recorded conversations on the ground that the affidavit failed the *Aguilar/Spinelli* standard.

4.    The trial court erroneously denied a change of venue.

5.    He was denied a fair trial due to an accumulation of errors: (a) denial of counsel at preliminary hearing, (b) excessive bail was set, (c) the heightened courthouse security violated the presumption of innocence, (d) the small size of the courtroom prevented effective communication with defense counsel, and (e) all errors alleged in claims 1-4.

Dkt. 8 at 15 (citing Dkt. 5); *see also* Dkt. 5-1 at 2-17.

## V.    DISCUSSION

Respondent asserts that some, but not all, of Petitioner's claims are eligible for federal habeas review. *See* Dkt. 8 at 15-16, 20-26. In particular, Respondent acknowledges that

REPORT AND RECOMMENDATION
PAGE - 17

1    Petitioner's fourth ground for relief, as well as parts of his second, third and fifth grounds for

2    relief, were properly presented to the Washington Supreme Court and are therefore eligible for

3    review.  *See id*.  Respondent argues, however, that Petitioner's first ground for relief, and parts of

4    his second, third and fifth grounds for relief, are procedurally barred from federal habeas review.

5    *See id*.  Finally, Respondent argues that Petitioner is not entitled to relief with respect to any of

6    the claims properly before this Court for review.  *See id*. at 30-68.

7        **A.    Exhaustion and Procedural Default**

8        The Court begins by addressing Respondent's argument that some of Petitioner's claims

9    are procedurally barred, either because the state courts expressly held the claims were

10   procedurally barred under RCW 10.73.090, or because the claims were not properly exhausted

11   and are now time barred.

12       *1.    Legal Standard*

13        A state prisoner is required to exhaust all available state court remedies before seeking a

14   federal writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  The exhaustion requirement is a matter

15   of comity, intended to afford the state courts "an initial opportunity to pass upon and correct

16   alleged violations of its prisoners' federal rights."  *Picard v. Connor*, 404 U.S. 270, 275 (1971)

17   (internal quotation marks and citations omitted).  In order to provide the state courts with the

18   requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims

19   to each appropriate state court for review, including a state supreme court with powers of

20   discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513

21   U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

22       "In order to 'fairly present' an issue to a state court, a petitioner must 'present the

23   substance of his claim to the state courts, including a reference to a federal constitutional

REPORT AND RECOMMENDATION
PAGE - 18

guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)). *See also Picard*, 404 U.S. at 275-78 (1971) (proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory on which the claim is based). Claims that are based on the same facts must be separately exhausted if they are supported by distinct constitutional theories. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). A habeas petitioner who fails to meet a state's procedural requirements for presenting his federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

When a prisoner defaults on his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id*. at 750. If the last state court to decide a federal claim clearly and expressly states that its judgment rests on a state procedural bar, there is a procedural default for purposes of federal habeas review. *Harris v. Reed*, 489 U.S. 255, 263 (1989). A prisoner also defaults on a federal habeas claim when he fails to exhaust his state court remedies with respect to a claim and the court to which the prisoner would be required to present his claim in order to satisfy the exhaustion requirement would now find the claim to be procedurally barred. *Coleman*, 501 U.S. at 735 n.1.

For a state procedural rule to be "independent," the state law ground for decision must not rest primarily on federal law or be interwoven with federal law. *Id*. at 734-35 (citing

REPORT AND RECOMMENDATION
PAGE - 19

1  *Michigan v. Long,* 463 U.S. 1032, 1040–41 (1983)).  A state procedural rule is "adequate" if it

2  was "firmly established" and "regularly followed" at the time of the default.  *Beard v. Kindler*,

3  558 U.S. 53, 60 (2009) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).  A state procedural

4  rule is not rendered inadequate simply because it is discretionary.  *Id*. at 60-61.

5         2.     *Grounds One and Five: Express Procedural Bar*

6        Petitioner asserts in his first ground for relief that the order authorizing the recording of

7  his conversations with Christopher Horton was invalid because the affidavit submitted in support

8  of the application to intercept and record the conversation was based on information obtained

9  from an unreliable informant.  Dkt. 5 at 5; Dkt. 5-1 at 2-3.  Petitioner asserts in his fifth ground

10  for relief that cumulative error deprived him of a fair trial.  Dkt. 5 at 10; Dkt. 5-1 at 14-17.

11  Among the errors asserted in Petitioner's cumulative error claim are that he was denied counsel

12  at his preliminary hearing, excessive bail was imposed, excessive courthouse security violated

13  the presumption of innocence, and the small courtroom prevented Petitioner from effectively

14  communicating with defense counsel.  Dkt. 5-1 at 14-15.  Respondent argues that Petitioner's

15  first ground for relief is procedurally barred, as is a portion of his fifth ground for relief, because

16  the Washington appellate courts declined to reach the merits of the claims in Petitioner's

17  personal restraint proceedings.  Dkt. 8 at 23-24.

18        The record shows that Petitioner presented his claim challenging the validity of the court

19  order authorizing police to record his conversations with Horton in his first supplemental

20  personal restraint petition.  *See* Dkt. 9, Ex. 34 at 26-34.  Petitioner likewise presented a claim in

21  that petition alleging that he was denied his right to a fair trial because of an assortment of

22  alleged errors, including the imposition of excessive bail, the use of restraints, the imposition of

23

REPORT AND RECOMMENDATION
PAGE - 20

1    excessive courthouse security, improper jury instructions, and interference with Petitioner's

2    ability to effectively communicate with counsel.  *Id.*, Ex. 34 at 36-41.

3            Petitioner filed this supplemental petition after the Court of Appeals granted him

4    permission to do so.  The Court of Appeals, in granting Petitioner leave to supplement,

5    specifically advised him that it was denying any intended request to suspend the one-year time

6    bar under RCW 10.73.090(1), and that he would have to "address whether this court should

7    consider waiving the one-year time bar or establish that the newly raised issue is not subject to

8    the time-bar in the supplemental petition."  *Id.*, Ex. 33.  Petitioner later expanded the claims at

9    issue here after being granted leave to supplement his personal restraint petition a second time

10   and again being advised that any new issues raised in his supplemental petition may be subject to

11   the one-year time bar.  *Id.*, Exs. 42, 43.  As relevant here, Petitioner added an argument to the

12   cumulative error claim asserted in his second supplemental petition, *i.e.*, that he was denied

13   counsel at his preliminary hearing.  *See id.*, Ex. 43 at 33-34.

14           The Court of Appeals, in its ruling denying Petitioner's personal restraint petition,

15   determined that the claims presented in his supplemental petitions were time-barred under RCW

16   10.73.090(1) because the petitions were filed more than one year after Petitioner's judgment and

17   sentence became final, and Petitioner had not "show[n], or even argue[d], that one of the

18   exceptions contained in RCW 10.73.100 applies or that his judgment and sentence is facially

19   invalid."  *Id.*, Ex. 46 at 2-3.  The Washington Supreme Court agreed with the reasoning of the

20   Court of Appeals and denied discretionary review of the claims asserted in Petitioner's

21   supplemental petitions on that basis.  *Id.*, Ex. 51 at 2.

22           The Ninth Circuit has recognized that the state time bar statute invoked by the

23   Washington Supreme Court to bar the claims asserted by Petitioner in his supplemental personal

REPORT AND RECOMMENDATION
PAGE - 21

1    restraint petitions, *i.e.*, RCW 10.73.090, provides an independent and adequate state procedural

2    ground to bar federal habeas review.  *See Casey v. Moore*, 386 F.3d 896, 920 (9th Cir. 2004);

3    *Shumway v. Payne*, 223 F.3d 982, 989 (9th Cir. 2000).  Because the Washington Supreme Court

4    concluded that the claims asserted in Petitioner's supplemental petitions were procedurally

5    barred pursuant to an independent and adequate state procedural rule, there is a procedural

6    default for purposes of federal habeas review.  Thus, federal habeas review of Petitioner's first

7    ground for relief, and the portions of his fifth ground for relief described above, is barred unless

8    Petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged

9    violation of federal law, or demonstrate that the failure to consider the claims will result in a

10   fundamental miscarriage of justice.

11              *2.      Grounds Two and Three:  Failure to Properly Exhaust*

12           Petitioner asserts in his second ground for relief that the prosecutor committed

13   misconduct in various ways, including making argumentative statements regarding Petitioner's

14   veracity during her cross-examination of Petitioner.  Dkt. 5-1 at 7.  The statements drew an

15   admonishment from the trial court during a break in Petitioner's testimony, and Petitioner claims

16   the statements prejudiced his chances for a fair trial.  *Id*.  Respondent argues that though

17   Petitioner made a similar allegation in his opening brief in the Court of Appeals on direct appeal,

18   he omitted any such claim from his petition for review in the Washington Supreme Court.  Dkt. 8

19   at 24-25.  This Court's review of the relevant state court briefs (Dkt. 9, Exs. 22, 26) reveals that

20   Petitioner made a claim on direct appeal, to both the Washington Court of Appeals and the

21   Washington Supreme Court, that the prosecutor called Petitioner a liar during closing argument,

22   but this Court can find no reference in either brief to Petitioner's claim concerning the

23   prosecutor's argumentative statements made during her cross-examination.  The record before

REPORT AND RECOMMENDATION
PAGE - 22

1    this Court also makes clear that Petitioner did not raise this claim in his personal restraint

2    proceedings.  This portion of Petitioner's second ground for relief has therefore not been

3    properly exhausted.

4            Petitioner asserts in his third ground for relief that his trial counsel rendered ineffective

5    assistance in numerous ways.  *See* Dkt. 5 at 8; Dkt. 5-1 at 8-10.  Respondent argues that though

6    Petitioner presented several allegations of ineffective assistance of trial counsel to the state

7    courts on direct appeal, the allegations made in his petition for review to the Washington

8    Supreme Court were much more limited than those made by Petitioner in his third ground for

9    federal habeas relief.  Dkt. 8 at 25-26.  In particular, Respondent asserts that Petitioner did not

10   argue to the Supreme Court, as he argues here, that defense counsel was ineffective for (1)

11   failing to object to Petitioner's statements regarding the arson of the Cantrell's home, (2) "doing

12   a poor job" of directing the defense investigator, (3) failing to prepare Petitioner to testify, (4)

13   failing to adequately impeach Christopher Horton, and (5) failing to seek suppression of the

14   recorded conversations between Petitioner and Horton on the grounds that the affidavit offered in

15   support of the application to intercept and record the conversations failed to meet the

16   *Aguilar/Spinelli* test.  *Id.*

17           The record before this Court confirms that these arguments were not presented to the

18   Washington Supreme Court on direct appeal.  *See* Dkt. 9, Ex. 26.  The record also confirms

19   Respondent's assertion that Petitioner never raised an ineffective assistance of counsel claim in

20   any of his personal restraint petitions.  *See id.*, Exs. 29, 34, 43, 53, 65.  Thus, the portions of

21   Petitioner's third ground for relief cited above have not been properly exhausted.[3]

22

23           [3] Petitioner presented additional claims in his third ground for federal habeas relief that Respondent doesn't
     address.  Those claims are that defense counsel was ineffective for (1) failing to question prosecution witnesses
     about Christopher Horton's life being threatened, and (2) failing to object when the prosecutor and trial judge insisted

REPORT AND RECOMMENDATION
PAGE - 23

Respondent argues that Petitioner, having failed to properly exhaust parts of his second and third grounds for relief, would now be barred from presenting those claims to the state courts under RCW 10.73.090.  Dkt. 8 at 24-26.  RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a criminal case must be filed within one year after the judgment becomes final.  Petitioner's judgment became final for purposes of state law on December 14, 2017, the date the Court of Appeals issued its mandate terminating direct review.  *See* RCW 10.73.090(3)(b).  He therefore had until December 14, 2018, to seek collateral review in the state courts.  It is clear that Petitioner would now be time barred from returning to the state courts to present his unexhausted claims, *see* RCW 10.73.090, and that he has therefore procedurally defaulted on these claims for purposes of federal habeas review.  Thus, federal review of these claims is also barred absent a showing of cause and prejudice.

### 3.    *Cause and Prejudice*

To satisfy the "cause" prong of the cause and prejudice standard, a petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule.  *Coleman*, 501 U.S. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  The Supreme Court, in *Murray*, provided examples of objective impediments which could constitute cause: (1) the factual or legal basis for a claim was not reasonably available at the time of the default; (2) interference by government officials made compliance with the procedural rule impracticable; and (3) ineffective assistance of counsel.  *Murray*, 477 U.S. at 488-89.

---

that counsel and Petitioner stop talking and communicate with each other in writing.  *See* Dkt. 5-1 at 9.  Those claims were apparently never presented to the appellate courts at any level of review and are therefore unexhausted as well.

REPORT AND RECOMMENDATION
PAGE - 24

To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent.  *Murray*, 477 U.S. at 495-96.

To the extent Petitioner addresses the cause and prejudice issue, his argument appears to relate only to the claims he attempted to add to his personal restraint proceedings through the supplemental petitions that the Court of Appeals determined were barred under RCW 10.73.090. This includes the claims asserted in Petitioner's first ground for federal habeas relief and in a part of Petitioner's fifth ground for relief.  In an apparent effort to show cause, Petitioner asserts that he was unable to meet the RCW 10.73.090 deadline for presenting these claims because of circumstances beyond his control at the Clallam Bay Corrections Center ("CBCC") in late 2018. Dkt. 29 at 9.

In particular, Petitioner cites to the fact that he was assaulted at CBCC on November 3, 2018, and was placed in the IMU for his own protection where he apparently remained before being moved to the Monroe Corrections Complex ("MCC").  *Id*.  Petitioner indicates that he arrived at MCC on December 3, 2018, but asserts it then took more than a month to receive his legal papers.  *Id*.  Petitioner indicates that he wrote to the Court of Appeals while still in the IMU and CBCC to inform them of his circumstances, and was granted an enlargement of time which he claims the appellate court failed to honor.  *Id*.

REPORT AND RECOMMENDATION
PAGE - 25

1       Any suggestion by Petitioner that the untimely filing of his supplemental personal

2   restraint petition is attributable to his reliance on the Court of Appeals' grant of an enlargement

3   time to file the supplement is not supported by the record.  The Court of Appeals, in granting

4   Petitioner additional time to supplement his existing personal restraint petition, did not waive the

5   filing deadline under RCW 10.73.090 and, in fact, expressly advised Petitioner he would have to

6   address the applicability of the time-bar in relation to any new claims asserted in his

7   supplemental petition.  Petitioner simply failed to heed this advisement, a failure that cannot be

8   attributed to the Court of Appeals.  Petitioner also fails to demonstrate that his alleged lack of

9   access to the materials necessary to complete and file his supplemental petition during November

10  and December 2018 is sufficient to establish cause for his procedural default.  It appears clear

11  that the legal and factual basis of the claims which Petitioner added to his personal restraint

12  petition by way of his supplement were available to him at the time of his original filing and

13  could have been included therein but were not.

14      This Court concludes that Petitioner has not established cause for his procedural default

15  as he does not identify any objective factor external to the defense that prevented him from

16  complying with the state's procedural rules.  Even assuming Petitioner's arguments were

17  sufficient to establish cause, his apparent attempt to demonstrate prejudice fails.  Petitioner

18  directs his prejudice argument only to his first ground for relief which pertains to the order

19  authorizing the recording of conversations between Petitioner and Christopher Horton.  *See* Dkt.

20  29 at 11.  However, Petitioner does little more than restate his claim and assert that he was

21  prejudiced by the actions of law enforcement in obtaining the order.  *Id*.  Notably, Petitioner's

22  first ground for relief, as asserted in his petition and as reiterated in his prejudice argument,

23  raises only issues of state law.  Petitioner does not allege any violation of his federal

REPORT AND RECOMMENDATION
PAGE - 26

1   constitutional rights nor does he make any effort to show that this alleged error infected his state

2   court proceedings "with error of constitutional dimensions." *See Frady*, 456 U.S. at 170.

3   Petitioner therefore fails to establish prejudice.  Likewise, petitioner makes no colorable showing

4   of actual innocence.

5          Accordingly, this Court recommends that Petitioner's federal habeas petition be denied

6   with respect to: (1) Petitioner's first ground for relief in its entirety; (2) Petitioner's second

7   ground for relief to the extent he alleges that the prosecutor committed misconduct by making

8   argumentative statements regarding Petitioner's veracity during her cross-examination of him;

9   (3) Petitioner's third ground for relief to the extent he alleges that defense counsel was

10  ineffective for failing to object to Petitioner's statements regarding the arson of the Cantrell's

11  home, for "doing a poor job" of directing the defense investigator, for failing to prepare

12  Petitioner to testify, for failing to adequately impeach Christopher Horton, for failing to seek

13  suppression of the recorded conversations between Petitioner and Horton on the grounds that the

14  affidavit offered in support of the application to intercept and record the conversations failed to

15  meet the *Aguilar/Spinelli* test, for failing to question prosecution witnesses about Mr. Horton's

16  life being threated, and for failing to object when the prosecutor and trial judge insisted that

17  counsel and Petitioner stop talking and communicate with each other in writing; and (4)

18  Petitioner's fifth ground for relief to the extent he alleges that he was denied counsel at his

19  preliminary hearing, that excessive bail was imposed, that excessive courthouse security violated

20  the presumption of innocence, and that the small courtroom prevented Petitioner from effectively

21  communicating with defense counsel.

22

23

REPORT AND RECOMMENDATION
PAGE - 27

**B.    Section 2254 Merits Review**

*1.    Federal Habeas Standard, 28 U.S.C. § 2254*

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.  *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id*. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).  The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* at 71. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is '*objectively unreasonable.*'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original). "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012). In addition, the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 2.    *Prosecutorial Misconduct*

Petitioner asserts in his second ground for relief that the prosecutor committed misconduct by (1) knowingly presenting perjured testimony, (2) withholding evidence from the

defense, (3) presenting improper arguments during closing argument, and (4) informing the jury that Petitioner was incarcerated.  Dkt. 5 at 7; Dkt. 5-1 at 4-7.

a.    Knowing Presentation of Perjured Testimony

It is well established that a conviction obtained by the knowing use of false evidence is fundamentally unfair, and that such a conviction may not stand under the Fourteenth Amendment if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *Napue v. Illinois*, 360 U.S. 264, 269-71 (1950).  *See also United States v. Agurs*, 427 U.S. 97, 103 (1976).  The knowing use of false evidence violates due process regardless of whether the prosecutor solicits the false evidence or merely allows it to go uncorrected when it appears.  *Napue*, 360 U.S. at 269.  In order to succeed on a claim that the prosecutor used false evidence to convict him, a petitioner "must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue*, 360 U.S. at 269-71).  The test for materiality under *Napue* is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Agurs*, 427 U.S. at 103.

Petitioner asserts that the prosecution knowingly presented the perjured testimony of prosecution witness Christopher Horton.  Dkt. 5-1 at 4.  Petitioner claims that Mr. Horton had a reputation for dishonesty and that the prosecution knew, or should have known, that Mr. Horton could not be trusted to tell the truth.  *Id.*  Petitioner presented his challenge regarding the prosecutor's conduct in relation to Mr. Horton's testimony to the state courts in his original personal restraint proceeding.  The Court of Appeals rejected the claim, concluding that the

1  evidence presented by Petitioner in "[a]t most . . . call[ed] into question Horton's general

2  veracity, an argument his counsel raised at trial. Dkt. 9, Ex. 46 at 3.

3         The Washington Supreme Court Commissioner agreed with the conclusion of the Court

4  of Appeals:

5         Mr. Valdez . . . argues that the State knowingly presented false testimony from its
          primary witness, Christopher Horton. But he does not demonstrate that the Court
6         of Appeals erred in finding no showing to support this argument. The materials
          Mr. Valdez presents go generally to Mr. Horton's credibility—a matter explored
7         at trial—and dispute certain of his factual statements, but they do not show that as
          to the central facts relevant to the charges, Mr. Horton perjured himself or that the
8         State knew his testimony was false. Mr. Horton went to the police with
          information that Mr. Valdez was soliciting murder, and subsequent recorded
9         conversations between Mr. Horton and Mr. Valdez corroborated that claim. Mr.
          Valdez simply does not show that the State knowingly offered false testimony.

10

11  *Id.*, Ex. 51 at 2.

12         Petitioner fails to demonstrate that the state appellate courts' resolution of his claim that

13  the prosecutor knowingly presented perjured testimony at trial is contrary to, or constitutes an

14  unreasonable application of, United States Supreme Court law, or that it is based on an

15  unreasonable determination of the facts. Petitioner, in this federal habeas proceeding, once again

16  appears to focus on general credibility issues concerning Mr. Horton and suggests that the

17  prosecution should have done more to investigate Mr. Horton's credibility. *See* Dkt. 5-1 at 4,

18  Dkt. 29 at 1-13. However, there is simply no evidence in the record before this Court that Mr.

19  Horton actually perjured himself on facts central to the charges, or that the state knew Mr.

20  Horton's testimony with respect to such facts was false. Petitioner's second ground for relief

21  should therefore be denied with respect to his claim that the prosecution knowingly used perjured

22  testimony to obtain a conviction.

23

REPORT AND RECOMMENDATION
PAGE - 31

b.     Failure to Disclose Evidence

Petitioner also argues as a part of his prosecutorial misconduct claim that the state improperly withheld from the defense evidence of additional prosecution interviews with Mr. Horton, in violation of *Brady*, the Rules of Professional Conduct, and state court discovery rules. Dkt. 5 at 7; Dkt. 5-1 at 4-5.  At issue here are the deputy prosecutor's notes of interviews, phone calls, and/or contacts she had with Mr. Horton prior to trial—eight in total—that were not disclosed to the defense.  *See* Dkt. 5-1 at 4-5.  Petitioner learned of these additional materials when he contacted the Wahkiakum County Prosecutor, post-trial, and requested copies of all the deputy prosecutor's interviews with prospective witnesses in his case.  *See* Dkt. 9, Ex. 29 at 61-65.  In his response to this request, the Prosecutor sent Petitioner a five-page letter containing a list of notes of the deputy prosecutor's contacts/interviews with individuals who had some form of involvement in Petitioner's case, and identifying which items the Prosecutor's Office was willing to provide and which items were subject to a claimed exemption.  *See id*.

As to Mr. Horton, the list identifies a transcript of a recording done by the deputy prosecutor of the defense interview of Mr. Horton in November 2015, and the deputy prosecutor's notes from that interview.  *Id*., Ex. 29 at 63.  It then references another eight sets of notes taken by the deputy prosecutor during interviews, phone calls, and/or contacts with Mr. Horton between July 27, 2015 and December 14, 2015.  *Id*.  The Prosecutor's Office indicated a willingness to provide a copy of the transcript of the defense interview but claimed that all of the deputy prosecutor's notes were exempt from disclosure under Washington Superior Court Criminal Rule (CrR) 4.7(f)(1) as they constituted work product.  *Id*., Ex. 29 at 64.

The Constitution requires that the prosecution disclose to an accused all evidence that is "both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v.*

REPORT AND RECOMMENDATION
PAGE - 32

*Bagley*, 473 U.S. 667, 674 (1985) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The duty

to disclose encompasses both exculpatory evidence and impeachment evidence.  *Strickler v.*

*Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*, 473 U.S. at 676).  Evidence is material "if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different."  *Kyles v. Whitely*, 514 U.S. 419, 433-34 (1995)

(citing *Bagley*, 473 U.S. at 682).  A 'reasonable probability' is a probability sufficient to

undermine confidence in the outcome.  *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678).

In order to state a *Brady* claim, a Petitioner must "do more than 'merely speculate'" that a piece

of undisclosed information might have been helpful or might have affected the outcome of the

trial.  *Runningeagle v. Ryan*, 686 F.3d 758, 769-70 (9th Cir. 2012) (citations omitted).

  The Washington appellate courts rejected Petitioner's *Brady* claim in Petitioner's original

personal restraint proceeding.  Dkt. 9, Ex. 46 at 3, Ex. 51 at 3.  The Washington Supreme Court

Commissioner explained his conclusion with respect to that claim as follows:

>   Mr. Valdez also contends that the State violated its disclosure obligation
> by not revealing additional interviews it had conducted with Mr. Horton outside
> the defense interview that the prosecutor attended and recorded.  The Court of
> Appeals said that Mr. Valdez failed to show that there were additional interviews,
> and that sets of prosecutor's interview notes referred to in a response to a later
> public records request (as to which the request was denied) were exempt from
> discovery under CrR 4.7(f)(1) (work product).  But more fundamentally, Mr.
> Valdez simply does not show that the State failed to reveal to the defense the
> substance of any statements Mr. Horton made.  CrR 4.7(a)(1)(i).

*Id*., Ex. 51 at 3.

  Rule CrR 4.7 governs discovery in criminal matters proceeding in the Superior Courts of

Washington.  The rule specifically exempts from disclosure "Work Product," which the rule

describes as "legal research or . . . records, correspondence, reports or memoranda to the extent

that they contain the opinions, theories, or conclusions of investigating or prosecuting

REPORT AND RECOMMENDATION

PAGE - 33

1  agencies[.]" CrR 4.7(f)(1).  The Washington Courts have determined that a prosecutor's notes of

2  a witness interview which do not contain the prosecutor's "opinions, theories or conclusions," do

3  not constitute protected work product.  *See State v. Garcia*, 45 Wn. App. 132, 138 (1986).

4      The United States Supreme Court has not decided whether a prosecutor's work product

5  must be disclosed under *Brady*.  *See Goldberg v. United States*, 425 U.S. 94, 98 n.3 (1976)

6  (reserving question).  However, the Ninth Circuit has held that "opinion work product," *i.e.*,

7  material encompassing a prosecutor's opinions, mental impressions of the evidence, or legal

8  theories, are generally not discoverable under *Brady* "*unless* they contain underlying exculpatory

9  facts." *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006) (emphasis in original).

10     The record in this case contains insufficient information for the Court to make a

11  determination as to whether the materials at issue here were properly designated as work product

12  and, thus, whether they were discoverable under either CrR 4.7 or *Brady*.  It is concerning to the

13  Court that interviews of the State's central witness in Petitioner's case, Mr. Horton, may have

14  been shielded from disclosure by a blanket assertion of work product.  Nonetheless, as noted

15  above, in order to demonstrate an entitlement to relief for an alleged *Brady* violation, a Petitioner

16  must demonstrate that he was prejudiced by the non-disclosure, something he fails to do in this

17  case.[4]

18     Petitioner asserts that the information contained in the prosecutor's notes "*may have* cast

19  a doubt on [Mr. Horton's] veracity. Dkt. 29 at 16 (emphasis added).  This assertion is clearly

20

21

22

23

---

[4] Whether or not the non-disclosure violated state rules of procedure is not an issue subject to review in this federal habeas action and, thus, this Court need not consider that issue here. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (it is not the province of federal habeas courts to re-examine state court conclusions regarding matters of state law); *Lewis v. Jeffers*, 497 U.S. 764 (1990) ("federal habeas corpus relief does not lie for errors of state law").

REPORT AND RECOMMENDATION
PAGE - 34

1    speculative.  Moreover, it is evident from materials in the record that Petitioner's counsel was

2    well aware that Mr. Horton was an unreliable witness, as this was an avenue of investigation

3    pursued by the defense investigator pretrial.  *See* Dkt. 9, Ex. 29 at 18- 21, 33-34; *see also id*., Ex.

4    15 at 20-22.  Petitioner's counsel repeatedly challenged Mr. Horton's credibility on cross-

5    examination and called witnesses on Petitioner's behalf who testified on issues going to Mr.

6    Horton's credibility, character, and motive.  *See id*., Ex. 9 at 94-117 (Horton cross-exam), Ex. 10

7    at 7-13, 19-41, 59-60 (Horton cross-exam), Ex. 15 at 26-33, 43-45 (Leon Gollersrud testimony),

8    Ex. 15 at 60-70, 74-78 (Fred Anderson testimony), Ex. 15 at 83-87 (Howard Lashbrook

9    testimony), Ex. 15 at 94-97, 101-02 (Katie Commons testimony), Ex. 16 at 5-10 (Larry Adams

10    testimony), Ex. 16 at 11-15 (Glenn Trusty testimony).

11           Counsel also argued vigorously during closing that Mr. Horton's credibility and

12    motivations should be carefully examined.  *Id*., Ex. 17 at 91-93.  Counsel highlighted

13    inconsistencies between Mr. Horton's testimony and other evidence in the record, challenged

14    Mr. Horton's character, raised questions about Mr. Horton's possible motives in going to the

15    police, and suggested, with reference to evidence in the record, that Mr. Horton had created a

16    situation intended to get Petitioner in trouble.  *Id*., Ex. 17 at 93-106, 110.  The record makes clear

17    that Petitioner's counsel had substantial material with which to challenge Mr. Horton's

18    credibility at trial.

19           The record also makes clear that additional evidence going to Mr. Horton's credibility is

20    unlikely to have changed the outcome of Petitioner's trial.  The trial judge, at the time of

21    Petitioner's sentencing, made this point succinctly.  Petitioner, in his comments to the court,

22    expressed his view that "Chris is a con.  He's conned this Court, he's conned Mr. Baur and he's

23    conned me."  *Id*., Ex. 19 at 19.  The trial judge, in his own comments, observed as follows:

REPORT AND RECOMMENDATION
PAGE - 35

1

2

> I agree with Mr. Valdez that Mr. Horton in general shouldn't be believed. But I
> don't place any particular credibility in what he had to say. But this is a situation,
> Mr. Valdez, where you didn't get convicted based on what Mr. Horton said. You
> got convicted based on what you said. No question about that in my mind.

3

4   *Id*., Ex. 19 at 21. The record before this Court amply supports this view.

5        In sum, the Washington appellate courts reasonably rejected Petitioner's *Brady* claim,

6   and Petitioner's federal habeas petition should therefore be denied with respect to this portion of

7   his second ground for relief.

8                              c.    Closing Arguments/Cross-Examination

9        Finally, Petitioner argues as a part of his prosecutorial misconduct claim that the

10  prosecutor engaged in misconduct when, during closing argument, she improperly inserted her

11  personal opinion into her argument regarding the testimony of defense witnesses and impugned

12  defense counsel, and when she improperly told the jury that Petitioner was incarcerated during

13  her cross-examination of defense witness Leon Gollersrud. Dkt. 5-1 at 5-6.

14       When a prosecutor's conduct is placed in question, unless the conduct impermissibly

15  infringes on a specific constitutional right, the standard of review is the "narrow one of due

16  process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168,

17  181-82 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974). To obtain relief on a

18  claim of prosecutorial misconduct, a federal habeas petitioner must do more than show that "the

19  prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at

20  180-81. A petitioner must demonstrate that the allegedly improper conduct "so infected the trial

21  with unfairness as to make the resulting conviction a denial of due process." *Id*. at 181 (quoting

22  *Donnelly*, 416 U.S. at 643).

23

REPORT AND RECOMMENDATION
PAGE - 36

1    In order to assess a claim that a prosecutor's comments rendered a trial so fundamentally

2 unfair as to deny a petitioner due process, it is necessary to examine the entire proceedings and

3 place the prosecutor's statements in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).

4 A reviewing court must keep in mind that during closing argument a prosecutor has wide latitude

5 to make reasonable inferences based on the evidence.  *United States v. Molina*, 934 F.2d 1440,

6 1445 (9th Cir. 1991).

7    On federal habeas review, prosecutorial misconduct which rises to the level of a

8 constitutional violation nonetheless provides a basis for federal habeas relief only if the

9 misconduct is deemed prejudicial under the test announced by the Supreme Court in *Brecht*.  *See*

10 *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).  Under *Brecht*, habeas relief may be granted

11 only if an error "had substantial and injurious effect or influence in determining the jury's

12 verdict."  *See Brecht*, 507 U.S. at 637.

13    The Washington Court of Appeals rejected Petitioner's claims of prosecutorial

14 misconduct on direct appeal, holding that Petitioner failed to preserve the arguments for appeal.

15 The Court of Appeals began its discussion of Petitioner's prosecutorial misconduct claims by

16 setting forth the relevant legal principles:

17    To prevail on a claim of prosecutorial misconduct, a defendant must show
   that the prosecutor's conduct was both improper and prejudicial.  *State v. Emery*,
18   174 Wn.2d 741, 756, 278 P.3d 653 (2012).  First, we determine whether the
   prosecutor's conduct was improper.  *Id*. at 759.  If the prosecutor's conduct is
19   improper, the question turns to whether the prosecutor's improper conduct
   resulted in prejudice.  *Id*. at 760-61.  Prejudice is established by showing a
20   substantial likelihood that the prosecutor's misconduct affected the verdict.  *Id*. at
   760.
21
      However, if a defendant does not object at trial, he or she is deemed to
22   have waived any error unless the prosecutor's misconduct was so flagrant and ill
   intentioned that an instruction could not have cured any resulting prejudice.  *Id*. at
23   760-61.  Under this heightened standard of review, the defendant must show that

REPORT AND RECOMMENDATION
PAGE - 37

1  "(1) 'no curative instruction would have obviated any prejudicial effect on the
jury' and (2) the misconduct resulted in prejudice that 'had a substantial
likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*,
172 Wn.2d 438, 455, 258 P.3d 43 (2011)).  In making a prejudice determination,
this court "focus[es] less on whether the prosecutor's misconduct was flagrant or
ill intentioned and more on whether the resulting prejudice could have been
cured." *Id*. at 762.

Prosecutors are afforded wide latitude to draw and express reasonable
inferences from the evidence in closing argument.  *State v. Reed*, 168 Wn. App.
553, 577, 278 P.3d 203, *review denied*, 176 Wn.2d 1009 (2012).  Prosecutors may
not rely on facts outside the evidence or use arguments calculated to inflame the
passions or prejudices of the jury.  *In re Pers. Restraint of Glassman,* 175 Wn.2d
696, 705, 286 P.3d 673 (2012); *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85
(1993), *review denied*, 124 Wn.2d 1018 (1994).  We do not look at the comment
in isolation but in the context of the total argument, the issues in the case, the
evidence, and the instructions given to the jury.  *State v. Yates*, 161 Wn.2d 714,
774, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008).  And we presume
the jury follows the trial court's instructions.  *State v. Southerland*, 109 Wn.2d
389, 39, 745 P.2d 33 (1987); *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d
1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

Dkt. 9, Ex. 25 at 24-25.

As to each of the statements challenged by Petitioner on direct appeal, and as to

Petitioner's claim that the prosecutor improperly elicited from defense witness Gollersrud

testimony that Petitioner has been incarcerated, the Washington Court of Appeals observed that

Petitioner did not object to the claimed errors at trial.  *See id*., Ex. 25 at 26-27.  The Court of

Appeals went on to conclude, with respect to all the claimed errors, that Petitioner had not shown

how a curative instruction to the claimed errors "would not have obviated any resulting

prejudice." *Id*.  As to Petitioner's challenges to the prosecutor's statements during closing

argument, the Court of Appeals concluded as well that Petitioner had not adequately supported

his assertions that the alleged improper statements were prejudicial.  *See id*.  As to all of the

challenged errors, the Court of Appeals held that Petitioner had waived any error for appeal.  *Id*.

REPORT AND RECOMMENDATION
PAGE - 38

1    The Court of Appeals, in concluding that Petitioner waived the alleged errors for appeal,

2    necessarily concluded that Petitioner had not demonstrated that the alleged misconduct "resulted

3    in prejudice that had a substantial likelihood of affecting the jury verdict." *See id.* at 24

4    (citations omitted). This standard is consistent with the United States Supreme Court standard of

5    review for prosecutorial misconduct claims which requires a showing that the alleged

6    misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of

7    due process." *Darden*, 477 U.S. at 181. The Court of Appeals' conclusion with respect to the

8    issue of prejudice is entitled to deference.

9    As will be discussed further below, the Court of Appeals, in addressing Petitioner's

10    ineffective assistance of counsel claim, which included challenges to defense counsel's failure to

11    object to these instances of alleged prosecutorial misconduct, concluded that some of the

12    challenged statements were, indeed, improper. However, Petitioner has not demonstrated, in

13    light of the record as a whole, that any of the challenged statements resulted in any prejudice.

14    Accordingly, the portion of Petitioner's second ground for relief pertaining to the prosecutor's

15    statements during closing argument and during her cross-examination of Mr. Gollersrud should

16    be denied as well.

17            *3.    Ineffective Assistance of Counsel*

18    Petitioner asserts in his third ground for relief that his trial counsel rendered ineffective

19    assistance by (1) failing to object to improper statements made by the prosecutor during closing

20    arguments, (2) failing to object under ER 404(b) to the admissibility of evidence of the plane

21    crash, the car crash, Petitioner's desire to burn the Bruneaus' catamaran, and the clogging of a

22

23

REPORT AND RECOMMENDATION
PAGE - 39

culvert, and (3) failing to object to the prosecutor's question to defense witness Leon Gollersrud about Petitioner's incarceration.[5]  Dkt. 5-1 at 8-9.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).  "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness.  *Id*. at 688.  Judicial scrutiny of counsel's performance must be highly deferential.  *Id*. at 689.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*.

Counsel's strategy with respect to objections is generally entitled to deference and reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*.; *see, e.g., United States v. Mejia–Mesa*, 153 F.3d 925, 931 (9th Cir. 1998) (explaining that "a few missed objections alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions (or failures to act) were

---

[5]  The Court has identified here only those portions of Petitioner's ineffective assistance of counsel claim that were properly exhausted.

REPORT AND RECOMMENDATION
PAGE - 40

pursuant to his litigation strategy and within the wide range of reasonable performance."). It is not ineffective assistance to fail to make a meritless objection. *See Dubria v. Smith*, 224 F.3d 995, 1003-04 (9th Cir. 2000) (en banc) (trial counsel was not ineffective for failing to object to prosecutor's closing argument when argument was not improper).

Trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *Molina*, 934 F.2d at 1448; *see U.S. v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Dubria*, 224 F.3d at 1003–04 (9th Cir. 2000) (finding that failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance).

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S.

REPORT AND RECOMMENDATION
PAGE - 41

101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

The Washington Court of Appeals denied Petitioner's ineffective assistance of counsel claims on direct appeal. The Court of Appeals began its discussion by setting forth the standard applicable to such claims, a standard consistent with that set forth by the Supreme Court in *Strickland*. Dkt. 9, Ex. 25 at 27-28. The Court of Appeals then went on to individually address each of the alleged instances of ineffective assistance. *See id*., Ex. 25 at 28-35.

With respect to Petitioner's ineffective assistance claim concerning counsel's failure to object to the admission of certain evidence under ER 404(b), including evidence of the plane crash, the car crash, Petitioner's statement about wanting to burn the Bruneaus' catamaran, and the clogging of the Bruneaus' culvert, the Court of Appeals rejected the claim on the grounds that Petitioner failed to argue "that an objection to this evidence under ER 404(b) would have likely succeeded" which was "fatal to [his] claim that his attorney provided ineffective assistance." Dkt. 9, Ex. 25 at 29. The Court of Appeals noted as well that even if Petitioner had presented such an argument, and the Court had agreed with it, Petitioner did not argue that "but-for counsel's failure to object, the result of the proceeding would have been different" which was in itself "fatal to [his] claim for reversal under ineffective assistance of counsel." *Id*., Ex. 25 at 29 n.5.

While Petitioner argues in his federal habeas petition that counsel's failure to object to the admissibility of this evidence under ER 404(b) was error, he offers no argument in support of

REPORT AND RECOMMENDATION

PAGE - 42

1  this claim.  Petitioner acknowledges that counsel objected to admission of the evidence on

2  relevancy grounds (Dkt. 5-1 at 8), but makes no effort to show that an objection under ER 404(b)

3  would have been successful in preventing admission of the evidence.  Petitioner likewise makes

4  no effort to show that but for the alleged error the result of his proceeding would have been

5  different.  Petitioner fails to demonstrate that the Court of Appeals' application of the *Strickland*

6  standard was unreasonable and, thus, this part of Petitioner's ineffective assistance of counsel

7  claim fails.

8    With respect to Petitioner's ineffective assistance of counsel claim concerning counsel's

9  failure to object to the prosecutor's question to witness Leon Gollersrud about visiting Petitioner

10  in jail and thereby revealing to the jury that Petitioner was incarcerated, the Court of Appeals

11  rejected the claim:

12     Valdez does not cite any law for the proposition that the prosecutor's
  question referencing Valdez's incarceration was improper.  Instead, Valdez cites

13    cases holding that appearing in shackles and showing booking photos to be
  reversible error.  However, Valdez does not explain how those cases apply to a

14    reference to incarceration during cross-examination.  *Dow*, 162 Wn. App. at 331.
  As such, Valdez fails to show that the prosecutor committed misconduct

15    warranting an objection when she asked a question of Gollersrud about visiting
  Valdez in jail.  Accordingly, Valdez fails to show his objection would have been

16    successful.  *Gerdts*, 136 Wn. App, at 727.

17  Dkt. 9, Ex. 25 at 35.  The Court of Appeals went on to note, as it did in relation to Petitioner's

18  claim concerning counsel's failure to object to the admissibility of bad acts evidence, that

19  Petitioner did not argue that "but-for counsel's failure to object, the result of the proceeding

20  would have been different" which was also "fatal to his claim for reversal under ineffective

21  assistance of counsel."  *Id*., Ex. 25 at 35 n.7.

22    Petitioner argues here that his incarceration "was irrelevant, and not in evidence, and was

23  prejudicial," and that it was therefore not reasonable for counsel to fail to object.  Dkt. 5-1 at 8-9.

REPORT AND RECOMMENDATION
PAGE - 43

However, Petitioner's conclusory assertion is insufficient to demonstrate that the Court of Appeals' conclusion constitutes an unreasonable application of the *Strickland* standard. The fact that Petitioner believes an objection should have been made does not, without more, demonstrate either deficient performance or prejudice. Thus, this part of Petitioner's ineffective assistance of counsel claim also fails.

Finally, with respect to Petitioner's ineffective assistance of counsel claims concerning counsel's failure to object to the prosecutor's conduct during closing arguments, including her (1) misstating the burden of proof and reasonable doubt, (2) expressing a personal opinion on the testimony of defense witnesses, and (3) impugning defense counsel, the Court of Appeals rejected the claims and explained its conclusion as follows:

> a. Misstating the Burden of Proof

> Valdez argues that his counsel provided ineffective assistance by failing to object when the prosecutor misstated its burden of proof by arguing beyond a reasonable doubt was not akin to "a strike of lightning" and when the prosecutor said Valdez "didn't prove anything" and Valdez's "lie" on the stand did not create a reasonable doubt. Br. of Appellant at 50-51; VRP (Feb. 25, 2016) at 1622-23. We disagree.

> i. "Strike of lightning"

> Valdez argues that the "strike of lightning" example was improper because the State argued that reasonable doubt is not speculation and the State "improperly conflates a strike of light[ning] with the real possibility that Mr. Horton . . . was able to get a photo off of Mr. Valdez's computer to frame him." Br. of Appellant at 50. Valdez asserts that "[i]f a jury finds that it was possible that Mr. Horton might have obtained the photo from Mr. Valdez's computer, that would create a reasonable doubt." Br. of Appellant at 50-51.

> Valdez's argument fails because it relies on the incorrect assumption that the State had to prove how Horton came into possession of the photo. This assumption is incorrect because the State's burden was "to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime with which [a defendant] is charged.'" *State v. W.R.*, 181 Wn.2d 757, 762, 336 P.3d 1134 (2014) (alteration in original) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct.

REPORT AND RECOMMENDATION
PAGE - 44

1068, 25 L. Ed. 2d 368 (1970)).  And how Horton came into possession of the photo is not a fact necessary to constitute the crime of solicitation to commit murder.  Therefore, Valdez's argument that the "strike of lightning" statement was improper fails, and Valdez fails to establish that an objection to that statement would have been successful.  VRP (Feb. 25, 2016) at 1615; *Gerdts*, 136 Wn. App. at 727.

> ii.  "Didn't prove anything" and "take the stand and actually lie"

Valdez argues that the prosecutor's statement that "the defendant—they didn't prove anything. . . . [A]pparently you can just say you didn't do something. You can just take the stand and actually lie and say you didn't do something and never meant it anyway, and that's all it takes.  That's not reasonable doubt," was improper because it misstated the burden of proof.  VRP (Feb. 25, 2016) at 1622-23.  We agree that this argument was improper because it incorrectly implied that the defendant had a burden to prove something.  *See W.R.*, 181 Wn.2d at 762 (holding that the State has the burden to prove every element of the charged crime).  Thus, an objection to this statement would have succeeded.  *Gerdts*, 136 Wn. App. at 727.

Despite this, Valdez fails to establish prejudice from his attorney's failure to object.  "A jury is presumed to follow the instructions of the court." *Southerland*, 109 Wn.2d at 391.  The jury was properly instructed on the State's burden of proof, and was instructed that the attorney's arguments are not the law and that the jury should disregard any remark or statement by the attorneys that was contrary to the instructions given by the court.

Moreover, Valdez cannot show there was a reasonable probability that the result of the proceeding would have been different because the evidence against Valdez was overwhelming.  At trial, the State presented evidence of the conversations recorded on Horton's wire where Valdez agreed to pay for Horton's alleged uncle to kill Robbins, talked about burning down the Cantrell's house and Bruneaus's catamaran, discussed his possession [of] marijuana, and discussed manufacturing the marijuana oil and his delivery of that marijuana oil.  The State further presented testimony that Valdez was angry at Robbins, the Cantrells, and the Bruneaus, decided to have Robbins killed, showed preparation to burn down the Cantrell's house, bragged about burning down the Cantrell's house, showed up at the Cantrell's a few hours after it burned down asking if anyone had died, articulated plans to burn down the Bruneaus's catamaran, and made and sold marijuana oil.  On this record, we hold that Valdez's assertions of ineffective assistance of counsel for failing to object to the prosecutor's misstating the burden of proof fail because Valdez cannot establish prejudice.  *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78.

REPORT AND RECOMMENDATION
PAGE - 45

1

b.  Professing a Personal Opinion

2

Valdez argues that his counsel provided ineffective assistance by failing to
object when the prosecutor improperly argued based on her personal opinion.
Specifically, Valdez argues the prosecutor's statement, "You can[ ] just take the
stand and actually lie and say you didn't do something and never meant it
anyway, and that's all it takes.  That's not reasonable doubt," and the prosecutor's
characterization of the testimony of Horton's uncle, Adams, as "shameful," were
improper personal opinions.  Br. of Appellant at 52-53.  We disagree.

3

4

5

6

The Rules of Professional Conduct prohibit lawyers from "stat[ing a]
personal opinion as to the justness of a cause, the credibility of a witness, . . . or
the guilt or innocence of an accused."  RPC 3.4(e).  Similarly, our Supreme Court
has stated that the prosecution may not assert its personal opinion as to a witness's
credibility.  *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984); *State v.
Lindsay*, 180 Wn.2d 423, 438, 326 P.3d 125 (2014).

7

8

9

Here, the prosecutor improperly asserted her personal opinion on the
justness and credibility of Adams and Valdez by stating that Adams's testimony
was "shameful" and Valdez had "lie[d]."  VRP (Feb. 25, 2016) at 1617, 1623.
However, Valdez fails to provide any argument that but-for counsel's failure to
object, the result of the proceeding would have been different, and Valdez's
failure to make that argument is fatal to his claim for reversal under ineffective
assistance of counsel.  *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at
78.  As discussed above, the evidence against Valdez was overwhelming.  We
hold that Valdez's challenge fails.

10

11

12

13

14

c.  Impugning Defense Counsel

15

Valdez argues that his counsel provided ineffective assistance by failing to
object when the prosecutor impugned defense counsel.  Valdez argues that the
prosecutor impugned defense counsel by "implying that the defense was trying to
trick the jury, divert their attention, and raise impossible defenses because the
evidence was so harmful."  Br. of Appellant at 54.  In support, Valdez likens these
comments to the prosecutors' comments in *Thorgerson*, 172 Wn.2d at 451, and
*Lindsay*, 180 Wn.2d at 433.  We disagree.

16

17

18

19

During closing argument in *Thorgerson*, the prosecutor "accused the
defense of engaging in 'sl[e]ight of hand' tactics and used disparaging terms like
'bogus' and 'desperation' to describe the defense."  172 Wn.2d at 450 (quoting
record).  The court held that the prosecutor's reference to the defense's case "as
'bogus' and involving 'sleight of hand'" was improper because it impugned
defense counsel's integrity and "implie[d] wrongful deception or even dishonesty
in the context of a court proceeding."  *Id*. at 451-52.  "Nonetheless," the
*Thorgerson* court held that "this misconduct was not likely to have altered the

20

21

22

23

REPORT AND RECOMMENDATION
PAGE - 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14

outcome" and "a curative instruction would have alleviated any prejudicial effect." *Id*. at 452.

In *Lindsay*, the prosecutor referenced the defenses closing argument by saying, "'This is a crock.  What you've been pitched for the last four hours is a crock.'" 180 Wn.2d at 433 (quoting the record).  The court held that the prosecutor impugned defense counsel by calling the closing arguments a "crock," reasoning that the term was short for an explicitly vulgar phrase, was at least as bad as "bogus" and "sleight of hand," and implied deception and dishonesty. *Id*.

Here, the statements by the prosecutor did not rise to the level of impropriety that the court confronted in *Thorgerson* and *Lindsay* because the statements did not imply that defense counsel was deceptive or dishonest nor did they otherwise comment on defense counsel's integrity.  The prosecutor argument that the defense's focus on the negative aspects of Horton's character "is a diversion" from the issue in the case was a fair argument that the jury should "not be[ ] diverted to other issues like did Chris [Horton] have a bag of weed . . . . Or was Chris a bad guy?  Or, you know, he told people that he could get people killed?" VRP (Feb. 25, 2016) at 1584.  And the prosecutor's comment, "Not a possibility.  Not a strike of lightning, but a reasonable doubt," was not addressing the defense's character or integrity.  VRP (Feb. 25, 2016) at 1615.  Rather, the prosecutor's statements directed the jury to focus on whether it had proven that Valdez committed the charged crimes.  Therefore, we hold that the prosecutor's statements did not impugn defense counsel, and Valdez fails to establish that an objection to that statement would have been successful. *Gerdts*, 136 Wn. App. at 727.[6]

Dkt. 9, Ex. 25 at 30-34 (footnote omitted).

As with Petitioner's earlier ineffective assistance of counsel claims, Petitioner fails to demonstrate with respect to this portion of his claim that the Court of Appeals' application of the *Strickland* standard was unreasonable.  Even as to those portions of his claim where the Court of Appeals concluded that an objection by counsel would have been successful, he has not established any prejudice arising out of counsel's failure to object.  The record confirms that the

---

[6] [Court of Appeals footnote 6] Additionally, Valdez does not argue that but-for counsel's failure to object, the result of the proceeding would have been different, and Valdez's failure to make that argument is fatal to his claim for reversal under ineffective assistance of counsel. *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78.

REPORT AND RECOMMENDATION
PAGE - 47

jurors were specifically instructed that "the lawyers' statements are not evidence" and that they "must disregard any remark, statement or argument that is not supported by the evidence or the law and [the court's] instructions." *Id.*, Ex. 17 at 45. Jurors are presumed to follow such instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Moreover, this Court's review of the trial transcript confirms that the evidence against Petitioner was, indeed, overwhelming, in light of the recorded conversations between Petitioner and Mr. Horton. Petitioner points to no evidence or argument demonstrating that there was a reasonable probability that the result of the proceedings would have been different absent the alleged errors by counsel. Accordingly, this portion of Petitioner's ineffective assistance of counsel claim fails as well.

### 4.    Change of Venue

Petitioner asserts in his fourth ground for relief that the trial court erred in denying his motion for change of venue because the pre-trial publicity was substantial and prejudicial, he and other participants involved in the case were well-known in the community, and Wahkiakum County is a small area. *See* Dkt. 5 at 10; Dkt. 5-1 at 11-13.

Trial by an impartial jury is fundamental to the fair administration of criminal justice. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). An impartial jury is one that is composed of "jurors who will conscientiously apply the law and find the facts." *Lockhart v. McCree*, 470 U.S. 162, 178 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)).

When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere . . . due process requires that the trial court

REPORT AND RECOMMENDATION
PAGE - 48

1  grant defendant's motion for a change of venue."  *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th

2  Cir. 1988) (citing *Rideau v. Louisiana,* 373 U.S. 723, 766 (1963)).  However, "pretrial

3  publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial."

4  *Skilling v. United States*, 561 U.S. 358, 384 (2010).  As the Supreme Court has observed,

5  "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require

6  *ignorance*."  *Id*. at 381 (citing *Irvin*, 366 U.S. at 722 (Jurors are not required to be "totally

7  ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors

8  will not have formed some impression or opinion as to the merits of the case.")).

9  There are circumstances in which pretrial publicity can raise a presumption of prejudice,

10  though the Supreme Court has cautioned that such a presumption is justified only in the "extreme

11  case."  *Id*.  An extreme case is one involving a "conviction obtained in a trial atmosphere that

12  was utterly corrupted by press coverage," where news stories surrounding the defendant included

13  reports of a "confession or other blatantly prejudicial information of the type readers or viewers

14  could not reasonably be expected to shut from sight," where very little time elapsed between the

15  crime and the trial, and where no other evidence "undermine[s] . . . the supposition of juror bias."

16  *Id*. at 380-84.

17  Where circumstances are not so extreme as to warrant a presumption of prejudice, a

18  petitioner asserting a constitutional violation based on the trial court's denial of a motion to

19  change venue must show that actual prejudice infected the jury.  *Id*. at 385.  The Supreme Court

20  has made clear that "[j]ury selection . . . is 'particularly within the province of the trial judge.'"

21  *Id*. at 386 (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976)).  "Reviewing courts are

22  properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that

23  judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the

REPORT AND RECOMMENDATION

PAGE - 49

record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Id.*  Thus, when considering the adequacy of jury selection, a reviewing court must be "attentive to the respect due to [trial court] determinations of juror impartiality and of the measures necessary to ensure that impartiality." *Id.* at 387.

The Washington Court of Appeals rejected Petitioner's claim regarding the denial of his motion to change venue on direct appeal.  The Court explained its conclusion as follows:

> Valdez argues the trial court abused its discretion in denying his motion to change venue from Wahkiakum County.  In support, Valdez cites the pretrial publicity, the small number of potential jurors in the county, and the large number of venire members who had heard of the case and knew the defendant or a witness.  We hold that the trial court did not abuse its discretion.

> We review a trial court's ruling on a motion to change venue for an abuse of discretion.  *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003).  A trial court abuses its discretion when it makes a decision that is manifestly unreasonable or based on untenable grounds or reasons, or when it fails to exercise its discretion, such as when it fails to make a necessary decision.  *State v. Stearman*, 187 Wn. App. 257, 264-65, 348 P.3d 394 (2015); *State v. Flieger*, 91 Wn. App. 236, 242, 955 P.2d 872 (1998), *review denied*, 137 Wn.2d 1003 (1999).

> "Appellate courts must independently review the record to determine whether the probability of prejudice is so apparent that it constitutes error to deny the motion for a change of venue."  *State v. Whitaker*, 133 Wn. App. 199, 210-11, 135 P.3d 923 (2006), *review denied*, 159 Wn. 2d 1017, *cert. denied*, 552 U.S. 948 (2007).  In considering the publicity a case receives, the relevant inquiry is the effect that the publicity had on the potential jurors, not whether inflammatory publicity existed.  *Jackson*, 150 Wn.2d at 269.  "The best way to find out if the jurors have opinions so fixed that they cannot be impartial is to attempt to empanel a jury."  *Whitaker*, 133 Wn. App. at 212; *see also Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.")  "The fact that the 'great majority of veniremen' remember a case, without more, is 'essentially irrelevant.  The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'"  *Jackson*, 150 Wn.2d at 269 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)) (alteration in original).

REPORT AND RECOMMENDATION
PAGE - 50

The *Jackson* court reasoned:

> [A]lthough the publicity was at times extensive, and some of it
> inflammatory, and the great majority of the veniremen had heard
> of the case, the care taken by the trial court to ensure an impartial
> panel leads us to conclude that the Court of Appeals correctly
> found no abuse of discretion.

*Id*. The *Jackson* court also found it "[s]ignificant[ ]" that the defendant did "not
identify any specific members of the seated jury or the alternates as being biased
nor d[id] he refer to any of the questions or responses during voir dire as
demonstrating these jurors' preexisting fixed opinions about the case." *Id*. at 272.
Moreover, the court noted, once the jury was empaneled, the jurors were
instructed to avoid media publicity or discussions about the case. *Id*.

Here, as in *Jackson*, Valdez fails to show that the publicity created "such
fixed opinions that [the jurors] could not judge impartially the guilt of the
defendant. *Id*. at 269 (quoting *Patton*, 467 U.S. at 1035). While it is true—as it
was in *Jackson*— that many in the venire had heard of the case, Valdez does not
identify any members of the jury who might have had a preconceived bias or any
responses during voir dire that evidence a bias.

In fact, the record does not support an inference of juror bias. First, the
attempt to empanel a jury was successful. *Whitaker*, 133 Wn. App. at 212 ("The
best way to find out if the jurors have opinions so fixed that they cannot be
impartial is to attempt to empanel a jury"); *see also Irvin*, 366 U.S. at 723 ("It is
sufficient if the juror can lay aside his impression or opinion and render a verdict
based on the evidence presented in court.") Second, Valdez identified only six
members of the venire whom he requested be excused for-cause after voir dire,
and the trial court excused five of those for-cause. Third, Valdez did not use a
peremptory challenge to excuse the remaining juror he requested be excused for-
cause. Fourth, Valdez did not use all of the peremptory challenges he was given.
Fifth, Valdez accepted the jury while there were still many members of the venire
who had not been dismissed. Finally, the trial court instructed the jury on more
than one occasion to avoid media coverage about the case and to avoid
discussions about the case until jury deliberations. Therefore, Valdez fails to
show evidence of juror bias. We hold that Valdez fails to show the trial court
abused its discretion in denying his motion to change venue.

Dkt. 9, Ex. 25 at 16-19.

Petitioner argued to the state courts that his was a case in which prejudice should be

presumed and that the denial of his motion for a change of venue violated his due process rights.

REPORT AND RECOMMENDATION
PAGE - 51

1    *See id.*, Ex. 22 at 33-40, Ex. 26 at 11.  Though the Court of Appeals analyzed the claim under an

2    abuse of discretion standard, and relied primarily on state case law in doing so, its analysis was

3    nonetheless consistent with clearly established federal law.  Indeed, the state case which largely

4    formed the basis of the Court of Appeals' decision, *Jackson*, was a case in which the Washington

5    Supreme Court identified the standard applicable to change of venue claims based on pretrial

6    publicity with specific reference to the United States Supreme Court's decisions in *Patton* and

7    *Irvin*.  And, the Court of Appeals, following its independent review of the record, reasonably

8    rejected Petitioner's change of venue claim.

9            The record confirms that there was some pretrial publicity in Petitioner's case, the bulk of

10   which was apparently confined to the two-week period immediately following Petitioner's arrest

11   on July 3, 2015.  There were a number of news stories published between July 4, 2015 and July

12   16, 2015, two of which provided a significant amount of detail regarding the investigation and

13   arrest.  *See* Dkt. 9, Ex. 21 at 7-21.  Subsequent articles published in August and September,

14   primarily pertained to scheduling and bail issues.  *See id.*, Ex. 21 at 22-27.  Jury selection in this

15   case did not begin until February 2016.  *See id.*, Exs. 4-5.  Though the two more detailed articles

16   published in early July 2015 contained some inflammatory details regarding the case, none of the

17   media coverage was, by itself, so substantial or inflammatory as to warrant a presumption of

18   prejudice particularly where, as here, the coverage was relatively limited in time and scope and

19   the most inflammatory articles were published approximately seven months before the trial

20   began.

21           Moreover, as the Court of Appeals properly noted, even in instances where inflammatory

22   publicity may have circulated in the community prior to trial, "[t]he relevant question is not

23   whether the community remembered the case, but whether the jurors ... had such fixed opinions

REPORT AND RECOMMENDATION
PAGE - 52

1   that they could not judge impartially the guilt of the defendant."  *Patton v. Yount*, 467 U.S. 1025,

2   1035 (1984).  The trial court, which was in the best position to assess the venire, and the impact

3   pretrial publicity may have had on the individual jurors, was satisfied that it was able to seat an

4   impartial jury panel.  The Court of Appeals, after conducting an independent review of the

5   record, clearly agreed.  This Court's review of the trial record supports the conclusions of the

6   state courts.  In sum, Petitioner fails to demonstrate that the decision of the Court of Appeals was

7   contrary to clearly established federal law or that he was denied an impartial jury.  Petitioner's

8   federal habeas petition should therefore be denied with respect to his fourth ground for relief.

9               *5.      Cumulative Error*

10          Petitioner asserts in his fifth ground for relief that the cumulative effect of the errors

11   identified in his petition denied him his right to a fair trial.  *See* Dkt. 5 at 10; Dkt. 5-1 at 14-17.

12   As explained above, a number of the arguments made by Petitioner in support of his cumulative

13   error claim were never presented to the state courts and are now procedurally barred.  Thus,

14   consideration of Petitioner's cumulative error claim is limited to the errors alleged in his first

15   four grounds for federal habeas relief.

16          The Ninth Circuit has recognized the "cumulative error" doctrine which provides that

17   even where no single error rises to the level of a constitutional violation, "the combined effect of

18   multiple trial court errors violates due process where it renders the resulting criminal trial

19   fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v.*

20   *Mississippi*, 410 U.S. 284 (1973)).  The Ninth Circuit explained in *Parle* that "the fundamental

21   question in determining whether the combined effect of trial errors violated a defendant's due

22   process rights is whether the errors rendered the criminal defense 'far less persuasive,' . . . and

23

REPORT AND RECOMMENDATION
PAGE - 53

1   thereby had a 'substantial and injurious effect or influence' on the jury's verdict." *Id*. at 928

2   (citations omitted).

3       The Washington Court of Appeals, on direct appeal, rejected petitioner's cumulative

4   error claim:

5           Valdez argues that the cumulative effect of the errors that occurred during
        his trial prevented him from receiving a fair trial.  We disagree.

6
            "Under the cumulative error doctrine, a defendant may be entitled to a
7       new trial when cumulative errors produce a trial that is fundamentally unfair."
        *Emery*, 174 Wn.2d at 766.  In *Emery*, the court held that the prosecutor committed
8       misconduct by impermissibly implying that the defense had a burden to prove
        some aspect of the case and by mischaracterizing the role of the jury.  *Id*. at 759-
9       60.  But the court held that the prosecutorial misconduct did not warrant reversal
        because the defendants had not shown the requisite prejudice.  *Id*. at 760-64.

10
            The *Emery* court also held that the cumulative effect of the errors at trial
11      did not warrant a new trial.  *Id*. at 766.  The court reasoned that the defense was
        only affected by the prosecutorial misconduct error, and it failed to demonstrate
12      the requisite prejudice for that error to be reversed.  *Id*.

13          Similarly, here, the prosecutor committed misconduct by misstating the
        burden of proof and improperly asserting her personal opinion, but Valdez fails to
14      show there was a reasonable probability that the result of the proceeding would
        have been different because the evidence against Valdez was overwhelming.
15      Therefore, we hold that Valdez has not shown that the cumulative effect of the
        errors at his trial require reversal.

16

17  (Dkt. 9, Ex. 25 at 35-36.)

18      Petitioner fails to demonstrate that the Court of Appeals' adjudication of his cumulative

19  error claim was contrary to, or constitutes an unreasonable application of, clearly established

20  federal law.  Petitioner, in his argument in support of his cumulative error claim, challenges yet

21  again the credibility of the prosecution's central witness, Christopher Horton, and offers his own

22  assessment of how the recordings of his conversations with Mr. Horton could, or should, have

23  been interpreted.  However, Petitioner's evaluation of the evidence, and suggestions as to how it

REPORT AND RECOMMENDATION
PAGE - 54

should have been interpreted, do not serve to advance his cumulative error claim. Though the Court of Appeals recognized errors in the prosecutor's closing argument, Petitioner has not shown that the prosecutor's statements, though improper, were sufficient to implicate due process concerns. In sum, Petitioner has not demonstrated that any of the errors alleged in his petition, either singularly or cumulatively, denied him a fair trial and, thus, his federal habeas petition should be denied with respect to his final ground for relief.

### C.     Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that Petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

### VI.     CONCLUSION

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas corpus be denied and that this action be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

REPORT AND RECOMMENDATION
PAGE - 55

and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 15, 2022**.

DATED this 21st day of March, 2022.


S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 56